LEE LITIGATION GROUP, PLLC
C.K. Lee (CL 4086)
Anne Seelig (AS 3976)
148 West 24th Street, Eighth Floor
New York, NY 10011
Tel.: (212) 465-1188
*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

LESLIE RAMIREZ,

               Plaintiff,

    v.

EXCLUSIVE MANAGEMENT SOLUTION GROUP, INC.,
ECO MISS BUBBLE, INC.
      d/b/a MISS BUBBLE LAUNDROMAT,
171ST & ST. NICHOLAS LAUNDROMAT INC.
      d/b/a MISS BUBBLE LAUNDROMAT,
      d/b/a LAUNDROMAT AUTHENTIC CLEANERS, and
DMITRIY BEREZOVSKY
      a/k/a DMITRY BEREZOVSKIY,

               Defendants.

---

Case No.:

**COMPLAINT**

**Jury Trial Demanded**

      Plaintiff, LESLIE RAMIREZ (hereinafter "Plaintiff"), on behalf of herself, by and through her undersigned attorney, hereby file this Complaint against Defendants EXCLUSIVE MANAGEMENT SOLUTION GROUP, INC., ECO MISS BUBBLE, INC. d/b/a MISS BUBBLE LAUNDROMAT, 171ST & ST. NICHOLAS LAUNDROMAT INC. d/b/a MISS BUBBLE LAUNDROMAT, d/b/a LAUNDROMAT AUTHENTIC CLEANERS, (collectively, "Corporate Defendants"), and DMITRIY BEREZOVSKY a/k/a DMITRY BEREZOVSKIY (collectively "Individual Defendants") (together with Corporate Defendants, "Defendants") and states as follows:

1

## INTRODUCTION

1.    Plaintiff alleges, pursuant to the Fair Labor Standards Act, as amended, 29 U.S.C. §§ 201 *et. seq.* ("FLSA"), that she is entitled to recover from Defendants: (1) unpaid wages, including overtime, due to time-shaving, (2) unpaid wages, including overtime, due to improper rounding, (3) liquidated damages, and (4) attorneys' fees and costs.

2.    Plaintiff further alleges, pursuant to the New York Labor Law ("NYLL"), that she is entitled to recover from Defendants: (1) unpaid wages, including overtime, due to time-shaving, (2) unpaid wages, including overtime, due to improper rounding, (3) unpaid spread of hours premiums, (4) statutory penalties, (5) liquidated damages, and (6) attorneys' fees and costs.

3.    Plaintiff additionally alleges that Defendants willfully filed fraudulent tax information returns regarding Plaintiff with the Internal Revenue Service ("IRS"), in violation of 26 U.S.C. § 7434.

4.    Plaintiff further alleges that Defendants breached their contract with Plaintiff by failing to pay employer payroll taxes for Plaintiff, as required by the Federal Insurance Contribution Act ("FICA"). In retaining those sums for themselves, Defendants unjustly enriched themselves at the expense of Plaintiff.

5.    Plaintiff further alleges that she was deprived of her statutory rights as a result of Defendants' unlawful discrimination on the basis of her gender and sex, in violation of New York State Human Rights Law, New York Executive Law § 296 ("NYSHRL"), and New York City Human Rights Law, Administrative Code of the City of New York § 8-107 ("NYCHRL"), and seeks to recover (1) economic damages, (2) compensatory damages, (3) punitive damages, and (4) attorneys' fees and costs.

6.    Plaintiff further alleges that she was deprived of her statutory rights as a result of

Defendants' unlawful discrimination on the basis of her gender and sex, in violation of New York City Human Rights Law, Administrative Code of the City of New York § 8-107 ("NYCHRL"), and seeks to recover (1) economic damages, (2) compensatory damages, (3) punitive damages, and (4) attorneys' fees and costs.

## JURISDICTION AND VENUE

7.    This Court has jurisdiction over this controversy pursuant to 29 U.S.C. § 216(b), 28 U.S.C. §§ 1331, 1337 and 1343, and has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. §1367.

8.    Venue is proper in the Southern District pursuant to 28 U.S.C. § 1391.

## PARTIES

9.    Plaintiff LESLIE RAMIREZ is a resident of New York County, New York.

10.    Defendants own and operate a laundromat chain at the following locations in New York and Florida:

    i.    1225 St. Nicholas Ave, New York, NY 10032;

    ii.    124 Nassau Ave, Brooklyn, NY 11222;

    iii.    1330 5th Ave, New York, NY 10026;

    iv.    1492 5th Ave, New York, NY 10035;

    v.    155 Calyer Street, Brooklyn, NY 11222;

    vi.    1746 1st Ave, New York, NY 10128;

    vii.    1909 Kings Highway, Brooklyn, NY 11229;

    viii.    2037 Adam Clayton Blvd, New York, NY 10027;

    ix.    2096 Madison Ave, New York, NY 10037;

    x.    211 West 16th Street, New York, NY 10011;

xi.    2167 3rd Ave, New York, NY 10035;

xii.    2171 Adam Clayton Blvd, New York, NY 10027;

xiii.    2234 1st Ave, New York, NY 10029;

xiv.    224 W 104 St, New York, NY 10025;

xv.    242 W 116 St, New York, NY 10026;

xvi.    2593 Frederick Douglas Blvd, New York, NY 10030;

xvii.    303 Flatbush Ave, Brooklyn, NY 11217;

xviii.    3476 Broadway, New York, NY 10031;

xix.    3643 Broadway, New York, NY 10031;

xx.    4091 Broadway, New York, NY 10032;

xxi.    410 East 59th Street, New York, NY 10022;

xxii.    465 Lenox Ave, New York, NY 10037;

xxiii.    47 Kingsland Ave, Brooklyn, NY 11221;

xxiv.    4710 Broadway, New York, NY 10040;

xxv.    489 2nd Avenue, New York, NY 10016;

xxvi.    545 Lenox Ave, New York, NY 10037;

xxvii.    617 Lenox Ave, New York, NY 10037; and

xxviii.    932 Amsterdam, New York, NY 10025;

(the "Laundromats").

11.    Defendants' Laundromats are also available on Defendants' website, https://www.msbubblegreen.com/locations. *See* **Exhibit A.**

12.    Plaintiff was employed primarily at Defendants' 1225 St. Nicholas Ave. location. Plaintiff RAMIREZ also performed work for Defendants' laundromat at 1492 5th Ave, New York,

NY 10035, and corresponded with all of Defendants' various locations about administrative matters.

13.     All the Laundromats are operated as a single integrated enterprise under the control of the top-level entity, Corporate Defendant EXCLUSIVE MANAGEMENT SOLUTION GROUP, INC. (also known as, and hereinafter referred to as, "EMSG Inc."), which is owned and operated by Individual Defendant DMITRIY BEREZOVSKY. Specifically, the Laundromats are engaged in related activities, share common ownership and have a common business purpose:

(a) All Laundromats are managed through the top-level entity, Corporate Defendant EXCLUSIVE MANAGEMENT SOLUTION GROUP, INC., owned and operated by Individual Defendant DMITRIY BEREZOVSKY. In *116 Street Laundromat And Dry Cleaning Inc. v. 240-42 West 116 Street Housing Development Fund Corporation* (Index No. 654876/2020) (where the plaintiff was the corporate entity which operates Defendants' Laundromat at 242 W 116 St, New York, NY 10026), Individual Defendant DMITRIY BEREZOVSKY submitted an affidavit in which, under penalty of perjury, he affirmed that he is "the President of Exclusive Management Solution Group, Inc." and that Corporate Defendant EMSG Inc. is "the Managing Agent of the Plaintiff, 116 Street Laundromat and Dry Cleaning Inc." *See* Index No. 654876/2020, NYSCEF Do. No. 3, the Affidavit of Individual Defendant DMITRIY BEREZOVSKY. 116 Street Laundromat and Dry Cleaning Inc., located at 242 W 116 St. New York, NY 10026 is listed on Defendants' joint website.

(b) Defendants advertise all their Laundromats on one single shared page of Defendants' website, https://www.msbubblegreen.com/locations. *See* **Exhibit A**.

(c) All the Laundromats are in the same business of providing organic laundry, wash and fold, and dry-cleaning services. *See* **Exhibit B**, the "Services & Prices NYC" page on Defendants' website, https://www.msbubblegreen.com/pricing.

(d) Inquiries regarding any of Defendants' Laundromats can be made over the phone through the same phone number, "(212) 928-WASH", which can be found on the "Contact Us" page on Defendants' website, https://www.msbubblegreen.com/contact. *See* **Exhibit C**.

(e) Defendants' website even provides the same phone number for customers to directly contact several of their Laundromats, despite the Laundromats having different physical addresses. Specifically, Defendants list "347-612-9607" as the direct contact number for the Laundromats listed below:

    a.  1492 5th Ave, New York, NY 10035;

    b.  155 Calyer Street, Brooklyn, NY 11222;

    c.  4091 Broadway, New York, NY 10032;

    d.  465 Lenox Ave, New York, NY 10037; and

    e.  617 Lenox Ave, New York, NY 10037.

*See* **Exhibit A**.

(f) Individuals can schedule pickups to have their clothing picked up and serviced by Defendants at the nearest of any of Defendants' Laundromats on Defendants' website, https://www.msbubblegreen.com/app/order/address. *See* **Exhibit D**.

(g) Defendants additionally offer their above pick up services to commercial clients and businesses, such as "Gyms, Spas and Salons, Hotels, Bars and Restaurants, Religious Facilities, Medical Offices, Department Stores, Other Laundromats and Dry Cleaning

Stores". Commercial clients can contact Defendants regarding these services or any of Defendants' Laundromats by calling one single phone number, "(212) 928-WASH", which can be found on the "Business Services" page on Defendants' website, https://www.msbubblegreen.com/business-services. *See* **Exhibit E**.

(h) Corporate Defendant EXCLUSIVE MANAGEMENT SOLUTION GROUP, INC. is included at the bottom of nearly every page on Defendants' website as "EMSG Inc." *See* **Exhibit B**.

14.    Corporate Defendant EXCLUSIVE MANAGEMENT SOLUTION GROUP, INC. is a domestic business corporation organized under the laws of New York State with a principal place of business located at 1492 5th Avenue, New York, NY 10035 and a registered address for service of process at c/o Dmitry Berezovsky, 5385 Netherland Avenue, Bronx, NY 10471.

15.    Corporate Defendant ECO MISS BUBBLE, INC., d/b/a MISS BUBBLE LAUNDROMAT is a domestic business corporation organized under the laws of New York State with a principal place of business and address for service of process located at 1492 5th Avenue, New York, NY 10035, c/o THE CORPORATION.

16.    Corporate Defendant 171ST & ST. NICHOLAS LAUNDROMAT INC. d/b/a MISS BUBBLE LAUNDROMAT is a domestic business corporation organized under the laws of New York State with a principal place of business located at 1225 St. Nicholas Avenue, New York, NY 10032 and a registered address for service of process at c/o EMSG INC., 1490 Fifth Avenue, New York, NY 10035.

17.    Individual Defendant DMITRIY BEREZOVSKY a/k/a DMITRY BEREZOVSKIY is the Owner of Corporate Defendants and has operational control of Corporate Defendants. Individual Defendant DMITRIY BEREZOVSKY exercises the power to, and also

delegates to managers and supervisors the power to: (i) fire and hire employees; (ii) supervise and control employee work schedules; (iii) determine the rate and method of pay; (iv) maintain employment records; and (v) otherwise affect the quality, terms and conditions of employment for Plaintiff. Individual Defendant DMITRIY BEREZOVSKY has authority over all employee-related decisions, including payroll, personnel, and wage and hour policies concerning Plaintiff. Individual Defendant DMITRIY BEREZOVSKY additionally exercises the authority to fire and hire, supervise and control work schedules, determine rate and method of pay, maintain employment records, and otherwise affect the terms and conditions of employment for managerial employees who directly supervise Plaintiff. Individual Defendant DMITRIY BEREZOVSKY ensures that managers implement Defendants' employment policies and pay practices and directs employees to effectively complete their job duties so that Corporate Defendants are operating efficiently and profitably.

18.     At all relevant times, each Corporate Defendant was and continues to be an "enterprise engaged in commerce" within the meaning of the FLSA, the NYLL, and the regulations thereunder.

19.     At all relevant times, the work performed by Plaintiff was directly essential to the business operated by Defendants.

20.     Plaintiff have fulfilled all conditions precedent to the institution of this action and/or such conditions have been waived.

## STATEMENT OF FACTS

### *Wage and Hour Claims:*

21.     Plaintiff RAMIREZ ("Plaintiff") was hired by Defendants in or around July 2021 to work as an Office Administrator and Laundromat Attendant at Defendants' Laundromat located at 1225 St Nicholas Ave, New York, NY 10032. Plaintiff also performed work for Defendants' laundromat at 1492 5th Ave, New York, NY 10035. Plaintiff worked for Defendants until on or around May 14, 2023.

22.     Plaintiff's duties were to communicate and coordinate with all of Defendants' New York Laundromats and perform accounting and paperwork.

23.     Plaintiff was also required to perform laundry services, including separating clothing, removing tags from clothing, packing up laundry, and assisting customers. Plaintiff's duties were twenty percent (20%) administrative work and (80%) manual labor.

24.     Plaintiff was paid various hourly rates during her employment and received periodic raises. At the time of her termination, Plaintiff was paid  $18.50 per hour.

25.     Throughout her employment, Plaintiff was scheduled to work Monday through Friday, from 10:00 a.m. to 6:00 p.m. However, Plaintiff was regularly required to work past her scheduled shifts until anywhere between around 8:00 p.m. a 10:00 p.m. This is because Individual Defendant DMITRIY BEREZOVSKY instructed Plaintiff to remain onsite working until "they finish work." Given this schedule, Plaintiff would work for a total of fifty (50) to sixty (60) hours in week.

26.     In addition to her hours worked at Defendants' laundromat, Plaintiff was required to perform additional off-the-clock work at home, such as responding to calls, communicating with Defendants' other Laundromats, and accounting for prices and sales for all Defendants'

Laundromats and dry cleaners, among other duties. Despite being required by Defendants to work off-the-clock from home, Plaintiff was never compensated by Defendants for her hours worked at home. As a result, throughout her employment, Plaintiff was timeshaved for approximately seven (7) hours every week.

27.     Throughout Plaintiff's entire period of employment, for each shift, Defendants always rounded Plaintiff's clock in and clock out times to her detriment, and only paid her for her scheduled shifts which always started and ended on either the whole hour or the half hour. As a result, Plaintiff was not compensated for the actual time she spent working before and after her scheduled shifts, which resulted in Plaintiff being compensated for less than the hours she actually worked. Through this policy, Defendants reduced their Plaintiff's compensable hours every pay period. As a result, Plaintiff was not properly compensated for all her hours worked.

28.     At all relevant times, Plaintiff was compensated by Defendants in cash and by personal checks. Plaintiff was paid by Defendants in only cash from the beginning of her employment until August 2022, and from then forward she was paid by Defendants in either cash or personal check.

29.     As a result of Defendants' paying Plaintiff in cash and personal checks, Defendants failed to provide Plaintiff with accurate IRS Forms W-2 for all the tax years of her employment and failed to properly record, account for, and report to the IRS all monies paid to Plaintiff. In failing to account for these monies in their IRS filings, Defendants filed fraudulent information in violation of 26 U.S.C. § 7434. Under 26 U.S.C. § 7434(b), Defendants are liable to Plaintiff for at least five thousand dollars per each fraudulent filing, which would have to be at least once per year.

30.     In violating the Internal Revenue Code by failing to provide proper W-2 forms,

Defendants also breached their contracts with Plaintiff to pay the employer's share of Social Security and Medicare taxes.

31.    Defendants also unjustly enriched themselves at the expense of Plaintiff by retaining monies that should have been remitted to the IRS on Plaintiff's behalf.

32.    As a result, Plaintiff will either (1) be liable to the IRS for the employer's share of FICA taxes or (2) upon retirement, suffer from diminished Social Security and Medicare benefits because they did not pay enough into the system.

33.    The employer's share of Social Security taxes is 6.2%. The employer's share of Medicare taxes is 1.45%. Accordingly, Defendants must compensate Plaintiff 7.65% of all her earnings from Defendants beginning six years prior to the filing of this Complaint.

34.    Even if Defendants could show that they paid some employees a part of their wages in check and filed the appropriate W-2s for those checks, Defendants would remain liable to those employees for failing to pay FICA taxes on the cash portions of their wages.

35.    Throughout her employment, Plaintiff did not receive any wage notice or accurate wage statements from the Defendants.

36.    In violation of the Wage Theft Protection Act ("WTPA")—incorporated into NYLL—Defendants knowingly and willfully operated their business with a policy of not providing wage notices to Plaintiff at the beginning of her employment with Defendants.

37.    Defendants further violated the WTPA by failing to provide Plaintiff with accurate wage statements, because wage statements that do not reflect the actual number of hours worked by the employee do not satisfy the requirements of the WTPA. *See Shi Yong Li v. 6688 Corp.*, 2013 U.S. Dist. LEXIS 148020, *6 (S.D.N.Y. Sept. 27, 2013) ("The wage statements provided failed to accurately indicate the amount of time *actually* worked by tipped employees") (emphasis

added); *Copper v. Cavalry Staffing, LLC*, 132 F. Supp. 3d 460, 468 (E.D.N.Y. 2015) (holding that "the 'number of overtime hours' that appears on the wage statement should include every hour *actually* 'worked' by the employee") (emphasis added); *Campos v. Bkuk 3 Corp.*, 2021 U.S. Dist. LEXIS 151528, *30 (S.D.N.Y. Aug. 10, 2021) ("Thus, when paystubs were received, they were not accurate insofar as they did not accurately reflect the hours *actually* worked") (emphasis added).

38.    In failing to provide proper wage statements and notices, Defendants have failed to comply with the law in a manner that entails a concrete harm to an interest identified by the New York State legislature. As one Court observed:

> Here, Plaintiffs allege that Defendants failed to furnish them with proper wage notices and statements, as required by NYLL §§ 195(1) and 195(3). These provisions were enacted as part of New York's Wage Theft Prevention Act ("WTPA"), N.Y. Lab. Law § 195, which sought "to expand the rights of employees to seek civil and criminal avenues of remedy for their employers failing to follow labor law appropriately and the specifications therein." N.Y. Spons. Mem., 2010 S.B. 8380. More specifically, the New York State Assembly passed the WTPA to address studies showing that a large number of employees were not being paid the wages owed to them, and that many employers were not adequately informing their employees of their wages and how they are calculated in language the employees could understand. *Id.* The New York State Assembly opined that existing penalties did not adequately deter employers from paying less than the wages owed, and stated that the WTPA would dramatically change this by increasing penalties for violating employees' rights. *Id.*

*Imbarrato v. Banta Mgmt. Servs.*, 2020 U.S. Dist. LEXIS 49740, *21-22 (S.D.N.Y. March 20, 2020)

39.    Here, Defendants' failure goes beyond generating a risk of harm to Plaintiff. Defendants' conduct actually harmed Plaintiff. Defendants' failure to provide wage notices and paystubs listing all hours actually worked and rates of pay, including overtime hours and overtime rates, deprived Plaintiff of the ability to contest the pay provided by Defendants, allowed Defendants to hide their wrong-doing, and necessitated the current litigation to vindicate Plaintiff's

rights. This conduct ensured Defendants' ability to further delay providing proper compensation to low wage earners entitled to protection under federal and state law. Defendants' failure to provide wage notices and wage statements to Plaintiff allowed Defendants to hide their responsibility and deprive Plaintiff of timely compensation.

40.     Had the wage statements Defendants provided to Plaintiff accurately listed the total number of hours Plaintiff actually worked, as required by law, Defendants would have had to either (a) increase the wages to correspond to the hours actually worked or (b) forthrightly acknowledge, by way of the wage statement, that Plaintiff's wages did *not* correspond to the hours Plaintiff actually worked. Either possibility would have allowed Plaintiff to vindicate her rights under the NYLL. The deprivation of these possibilities therefore constitutes an injury.

41.     The failure to provide proper wage notices and wage statements continues to result in delayed payment of all proper wages owed to Plaintiff. This delayed payment caused Plaintiff to struggle to pay bills and other debts.

42.     Defendants knowingly and willfully operated their business with a policy of not providing proper wage notices and wage statements as required by NYLL.

43.     The direct effect of understating the number of hours an employee worked is to reduce the wages that employees are listed as having earned on their wage statements. The direct effect of this, in turn, is to reduce the employee earnings that the employer later reports to the IRS through the employee's W-2 form, as such information is derived from the information on employees' wage statements. See *Mills v. Mills*, 2021 Minn. Dist. LEXIS 200, *5 (Minn. Dist. Ct., Anoka County, Tenth Judicial District May 20, 2021) ("Petitioner's gross annual income, based on her 2020 W-21 and paystub dated 12/24/20, is $130,321.30"); T.F. v. N.F., 820 N.Y.S.2d 846, 846 (Sup. Ct., Suffolk Cty., June 22, 2006) ("In 2005 the plaintiff earned $ 133,086 as reflected

on his final year paystub and W-2").[1]

44.     The effect of reporting reduced wages on an employees' W-2 is, in turn, to reduce the amount of social security benefits available to the employee, as an employee's entitlement to benefits reflects how much money he or she is reported as having contributed to the social security system. *See McGauran v. Soc. Sec. Comm'n*, 2001 U.S. Dist. LEXIS 3187, *7 (N.D. Cal. March 19, 2001) ("Social security benefits are based upon the worker's earnings as reported to the [SSA] . . . [and] the worker's earnings are used to determine insured status for entitlement to retirement and to calculate cash benefit rates." (quoting Social Security Administration, Handbook § 1400 (1997)); *Coward v. Zurich Am. Ins. Co.*, 2011 U.S. Dist. LEXIS 74543, *3 (N.D. Ill. July 8, 2011) ("Under the Social Security statute, entitlement depends on 'the total of the wages paid . . . to an individual in a calendar year.'") (quoting 42 U.S.C. § 413(a)(2)(A)(ii)).

45.     "In the wake of the Supreme Court's decision in *TransUnion*, courts in this Circuit have held that plaintiffs lack standing to bring wage notice and statement claims under the NYLL absent any concrete, downstream consequences of the recordkeeping violation." *Chen v. Lilis 200 W. 57th Corp.*, No, 2023 U.S. Dist. LEXIS 38163, at 18, 2023 WL 2388728, at *8 (S.D.N.Y. Mar. 7, 2023). "On the other hand, 'allegations' that go 'beyond asserting a bare statutory violation and sufficiently allege concrete harm' resulting from 'the underpayment of wages' pass muster because 'monetary injury is a concrete harm sufficient for purposes of Article III standing.'" *Thompson v.*

---

[1] It is true that the wages reported on W-2 forms are not always precisely identical to those listed on an employees' last paystub for the year. One reason for is, as the IRS explains, that "W-2 wages include: (i) the total amount of wages as defined in section 3401(a); (ii) the total amount of elective deferrals (within the meaning of section 402(g)(3)); (iii) the compensation deferred under section 457; and (iv) the amount of designated Roth contributions (as defined in section 402A)." https://www.irs.gov/pub/irs-drop/rp-19-11.pdf. However, the possibility, that wages listed on a W-2 might be affected by such considerations does not change the fact that the base wages on the W-2 are derived from paysubs. The paystub processing service *realcheckstubs* explains: "A pay stub contains crucial information that assists in calculating W2 wages. Paystub provides gross wages, deductions, taxes withheld, and other income-related data. Individuals gather the necessary figures required for accurate W2 calculation by referring to the pay stub." https://www.realcheckstubs.com/blog/paystubs/6-steps-how-to-calculate-w-2-wages-from-paystub.

*Elev8 Ctr. N.Y.*, LLC, 2023 U.S. Dist. LEXIS 122504, *21 (S.D.N.Y. July 17, 2023) (quoting

*Mateer v. Peloton Interactive, Inc.*, 2022 U.S. Dist. LEXIS 125017, at *4 (S.D.N.Y. July 14,

2022)).

46.     Here, it is clear that Defendants' failure to provide Plaintiff with accurate wage

statements entailed "concrete, downstream consequences" involving monetary injury. Had the

number of hours been accurately reported for a given pay period, Defendants' automatic payroll

system would have correspondingly increased the wages due for that period, which in turn would

have been reflected in the W-2s that Defendants submitted to the IRS on behalf of Plaintiff. That,

in turn, would have increased Plaintiff's entitlement to social security benefits. Because the

inaccuracy prevented this outcome, it constitutes an injury sufficient to provide Plaintiff with

Article III standing.

47.     Courts agree that the misreporting of wages constitutes a concrete injury cognizable

under Article III:

> The Seventh Circuit in *Calderon* squarely addressed FICA standing. The plaintiffs
> in *Calderon* were former employees alleging the employer failed to pay
> their FICA taxes. 999 F.2d at 1105-06. The Seventh Circuit found that the plaintiffs
> lacked standing to compel the employer to pay their FICA taxes because
> "[b]enefits do not. . . depend on whether the employer actually paid the
> taxes." *Id*. at 1106. Plaintiffs could, however, enforce FICA's reporting
> requirement because it is the reporting of income that triggers benefits, and losing
> benefits is an injury under *Lujan*. *Id*. Whether the employer in *Calderon* made
> FICA payments on the plaintiffs' behalf had no bearing on the plaintiffs'
> entitlement to benefits. *Id*. "[T]he plaintiff's real interest lies in ensuring that the
> [employer] make the proper reports of their income." *Id*.

*Coward*, 2011 U.S. Dist. LEXIS 74543, at *3-4.

48.     The case at bar is somewhat different from *Coward* inasmuch as Defendants

actually underpaid Plaintiff rather than merely misreporting her income. But this distinction has

no bearing on the question of Article III standing, since it is still the case that "it is the reporting

of income that triggers benefits, and losing benefits is an injury." *Id.*  Plaintiff lost benefits by

virtue of how Defendants reported their income, and how Defendants reported Plaintiff's income

was the direct outcome of the inaccuracies in her wage statements. That is why "[p]laintiffs have

standing to enforce the statutory reporting requirements" imposed by the WTPA. *Calderon v.*

*Witvoet*, 999 F.2d 1101, 1106 (7th Cir. 1993).

49.    The *Calderon* court stressed that an employee's interest in ensuring that an

employer properly report the employee's income is amplified by the difficulty of persuading the

government to correct errors:

> The practical difficulty is that eligibility for Social Security benefits presumptively
> depends on reports that employers send to the government. A worker who seeks
> credit for unreported income bears the burden of proof, 42 U.S.C. § 405(c)(3), (4),
> which will be hard to carry if the employer has not furnished the customary
> documentation. The government believes employers who report earnings, because
> these reports are costly to make--they entail paying a substantial tax. The
> government tends not to believe undocumented claims by employees, because these
> claims are essentially costless yet could establish entitlement to large pensions or
> disability benefits.
>
> All of this means that the plaintiffs' real interest lies in ensuring that the Witvoets
> make the proper reports of their income.

*Id.*

50.    Here, the problem is not merely challenging but insurmountable. Plaintiff cannot

even attempt to have her earnings report corrected because Defendants *did* report what they

actually paid Plaintiff. The problem, rather, is that Plaintiff were underpaid. Yet the ultimate effect

is the same—reduced social security eligibility. Because "[u]nder the Social Security statute,

entitlement depends on 'the total of the wages paid . . . to an individual in a calendar year,'"

Plaintiff was irreversibly injured with respect to her social security benefits as soon as Defendants

sent her W-2 to the IRS. *Coward*, 2011 U.S. Dist. LEXIS 74543, at *3 (N.D. Ill. July 8, 2011)

(quoting 42 U.S.C. § 413(a)(2)(A)(ii)).

51.     Defendants knowingly and willfully operated their business with a policy of not paying Plaintiff proper wages, including overtime, for all hours worked due to time shaving, in violation of the FLSA and the NYLL.

52.     Defendants knowingly and willfully operated their business with a policy of not paying Plaintiff proper wages, including overtime, for all hours worked due to time illegal rounding of hours, in violation of the FLSA and the NYLL.

53.     Defendants knowingly and willfully operated their business with a policy of not paying spread of hour premiums to Plaintiff in violation of the NYLL.

54.     Defendants knowingly and willfully operated their business with a policy of not providing wage and hour notices to Plaintiff as required under the NYLL.

55.     Defendants knowingly and willfully operated their business with a policy of not providing accurate wages statements to Plaintiff as required under the NYLL, as the wage statements did not accurately reflect the number of hours worked by employees.

*__Gender Discrimination and Hostile Work Environment__*

56.     Throughout her employment, Plaintiff suffered from Defendants fostering a hostile work environment based on her sex and gender.

57.     In or around October 2021, Defendants hired Juan Ramirez (hereinafter referred to as "Juan") as Manager at Defendants' Laundromat at 1225 St Nicholas Ave, New York, NY 10032, where Plaintiff primarily worked.

58.     Juan immediately began sexually harassing Plaintiff. Juan made inappropriate sexual comments, advances, and even assaulted Plaintiff by trying to touch her.

59.     Juan constantly harassed Plaintiff by calling her to discuss work related matters but ending the calls by making unwanted sexual advances to Plaintiff and asking her out on dates,

always in sexually inappropriate ways.

60.    From the moment he was appointed Manager, Juan would make crude and insulting remarks to all female employees working within at the Laundromat. For instance, Juan would walk behind Florinda [Last Name Unknown] a female employee, place his hands around her waist and press himself against her.

61.    Juan created a hostile working environment for Plaintiff due to his inappropriate behavior including sexual harassment and assault for one and a half years. Finally, toward the end of Plaintiff's employment, a 17-year-old female employee (hereinafter referred to as "Employee A") was hired. Juan immediately began making unwanted advances towards Employee A through unsolicited texts and communications with her. All the while, Juan would be making sexually suggestive comments and gestures whenever Employee A was in his vicinity. One day when Employee A was passing by with a cart of laundry, Juan turned, stopped her and said "[Employee A], why did you not touch my dick when you passed by? Why?" Juan says this very frequently to all female staff. He does this in front of customers, everyone on the floor.

62.    On or about March 1, 2023, Plaintiff, motivated by Juan's assaults on 17-year-old Employee A, complained to Individual Defendant DMITRIY BEREZOVSKY on behalf of Defendants' female staff who were sexually harassed by manager Juan, who created a hostile working environment for one and a half years.

63.    In response to being informed of Florinda's interaction with Juan, and the way Juan also harassed and tried to touch Defendants' female employees in unwanted sexual manners, Individual Defendant DIMITRIY BEREZOVSKTY refused to take any actions. Instead, DIMITRIY BEREZOVSKTY justified his inaction by saying "Florinda has a husband, he can beat [Juan] up here. He can kill him if he wants, I don't care. I won't stop him." He dd not even seem

to care that Juan continuously sexually harassed the female employees at the Laundromat.

64.    Despite the fact that Individual Defendant DIMITRIY BEREZOVSKTY is the owner and principal of the business, with the ability to permanently stop Juan's illegal infringement of Plaintiff's rights under NYSHRL and NYCHRL, Individual Defendant DIMITRIY BEREZOVSKTY refused to take any actions, even though he was legally mandated to.

65.    It was only after Plaintiff's insistence, that Individual Defendant DMITRIY BEREZOVSKY decided to even acknowledge the problems created by Juan's sexual harassment.

66.    As a result, Individual Defendant DMITRIY BEREZOVSKY met with Juan for a mere three to five minutes. But no actual actions were taken to prevent Juan from continuing the sexual harassment that Plaintiff and other female employees complained about.

67.    Plaintiff, in exasperation, asked Individual Defendant DMITRIY BEREZOVSKY if the short conversation with Juan would be the entirety of the disciplinary action taken for Juan's behavior, to which Individual Defendant DMITRIY BEREZOVSKY affirmed, "What else do you want me to do? Kill him?"

68.    As the owner and employer of the Laundromats, where Plaintiff and Defendants' female staff worked, it was Individual Defendant DMITRIY BEREZOVSKY's responsibility to keep the work environment safe and ensure that the Manager was not sexually harassing employees. Individual Defendant DMITRIY BEREZOVSKY knew what was going on but demonstrated no interest in the safety of his female employees.

69.    Plaintiff resigned on May 14, 2023. During the year and eight months that Plaintiff worked for Individual Defendant DMITRIY BEREZOVSKY at Defendants' Laundromat, Plaintiff witnessed insults, racist comments, harsh reprimands, and violation of labor laws. During

her employment, Plaintiff was subjected to Defendants' and her Manager Juan's lack of respect for her and her coworkers and a hostile work environment due to gender discrimination.

70.    Plaintiff retained Lee Litigation Group, PLLC to represent Plaintiff in this litigation, and has agreed to pay the firm a reasonable fee for its services.

## STATEMENT OF CLAIMS

## COUNT I

## VIOLATION OF THE FAIR LABOR STANDARDS ACT

71.    Plaintiff realleges and reavers all the foregoing allegations in this Complaint as if fully set forth herein.

72.    At all relevant times, upon information and belief, Defendants were and continue to be employers engaged in interstate commerce and/or the production of goods for commerce within the meaning of the FLSA, 29 U.S.C. §§ 206(a) and 207(a). Further, Plaintiff is a covered individual within the meaning of the FLSA, 29 U.S.C. §§ 206(a) and 207(a).

73.    At all relevant times, Defendants employed Plaintiff within the meaning of the FLSA.

74.    Upon information and belief, at all relevant times Corporate Defendants had gross revenues in excess of $500,000.

75.    At all relevant times, Defendants had a policy and practice of failing to pay wages to Plaintiff for all regular and overtime hours worked due to time shaving.

76.    At all relevant times, Defendants had a policy and practice of failing to pay wages to Plaintiff for all regular and overtime hours worked due to illegal rounding of hours.

77.    Records, if any, concerning the number of hours worked by Plaintiff and the actual compensation paid to Plaintiff, are in the possession and custody of Defendants. Plaintiff intends

to obtain these records by appropriate discovery proceedings to be taken promptly in this case and, if necessary, will then seek leave of Court to amend this Complaint to set forth the precise amount due.

78.     Defendants knew of and/or showed a willful disregard for the provisions of the FLSA as evidenced by their failure to compensate Plaintiff for all of Plaintiff's hours worked.

79.     Defendants failed to properly disclose or apprise Plaintiff of her rights under the FLSA.

80.     As a direct and proximate result of Defendants' willful disregard of the FLSA, Plaintiff is entitled to recover liquidated damages pursuant to the FLSA.

81.     Due to the intentional, willful, and unlawful acts of Defendants, Plaintiff suffered damages in an amount not presently ascertainable of unpaid minimum wages, unpaid overtime wages, plus an equal amount as liquidated damages.

82.     Plaintiff is entitled to an award of her reasonable attorneys' fees and costs pursuant to 29 U.S.C. § 216(b).

## COUNT II

## VIOLATION OF THE NEW YORK LABOR LAW

83.     Plaintiff realleges and reavers all the foregoing allegations in this Complaint as if fully set forth herein.

84.     At all relevant times, Plaintiff was employed by Defendants within the meaning of the New York Labor Law §§ 2 and 651.

85.     Defendants willfully violated Plaintiff's rights by failing to pay her the proper compensation for all hours worked due to a policy of time-shaving.

86.     Defendants willfully violated Plaintiff's rights by failing to pay her the proper

compensation for all hours worked due to a policy of improper rounding.

87.     Defendants failed to compensate Plaintiff with their spread of hours premiums for shifts worked in excess of 10 hours, in direct violation of the NYLL.

88.     Defendants knowingly and willfully failed to provide proper wage notices to Plaintiff as required by New York Labor Law.

89.     Defendants knowingly and willfully failed to provide proper wage statements to Plaintiff with every wage payment, as required by New York Labor Law § 195(3).

90.     Due to Defendants' New York Labor Law violations, Plaintiff is entitled to recover from Defendants her unpaid wages, unpaid overtime wages, statutory penalties, liquidated damages, reasonable attorneys' fees and costs and disbursements of the action, pursuant to New York Labor Law.

## COUNT III

## CIVIL DAMAGES FOR FRAUDULENT FILING OF INFORMATION RETURNS UNDER 26 U.S.C. § 7434(a)

91.     Plaintiff repeats each and every previous allegation in this Complaint as if fully set forth herein.

92.     Under the Internal Revenue Code, "[i]f any person willfully files a fraudulent information return with respect to payments purported to be made to any other person, such person may bring a civil action for damages against the person so filing such return." 26 U.S.C. § 7434(a).

93.     By failing to provide Plaintiff with accurate IRS Forms W-2 for all of the tax years during which she was employed by Defendants and failing to properly record, account for, and report to the IRS all monies paid to Plaintiff as wages, Defendants filed fraudulent information returns with the IRS, in violation of 26 U.S.C. § 7434.

94.    Defendants knew they had a legal duty not to misrepresent to the IRS the amount of money they were paying employees. Defendants' actions were willful violations of, or showed reckless disregard for, the provisions of the Internal Revenue Code.

95.    Pursuant to 26 U.S.C. § 7434(b)(3), Defendants are also liable to Plaintiff for reasonable attorneys' fees.

**COUNT IV**

**BREACH OF CONTRACT**

96.    Plaintiff repeats each and every previous allegation in this Complaint as if fully set forth herein.

97.    "In New York, all contracts imply a covenant of good faith and fair dealing in the course of performance … This covenant embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract … [T]he duties of good faith and fair dealing … encompass any promises which a reasonable person in the position of the promisee would be justified in understanding were included [in the contract]." *511 W. 232nd Owners Corp. v. Jennifer Realty Co*., 98 N.Y.2d 144, 153, 773 N.E.2d 496, 500-501, 746 N.Y.S.2d 131, 135-136, 2002 N.Y. LEXIS 1579, *10-11 (2002).

98.    When Plaintiff accepted the employment offer from Defendants, the parties entered a contract, and the covenant of good faith and fair dealing implicit therein required Defendants to pay Plaintiff in accordance with all applicable laws. This involved, *inter alia*, a duty to abide by the Internal Revenue Code and pay all required FICA taxes.

99.    Defendants breached this duty when they decided to pay Plaintiff in cash and not file proper W-2. As a result, Plaintiff lost part of the benefit of the bargain for which she contracted,

23

suffering a loss in the amount of the FICA taxes that Defendants should have paid on her behalf but did not.

## COUNT V

## UNJUST ENRICHMENT

100.    Plaintiff repeats each and every previous allegation in this Complaint as if fully set forth herein.

101.    To state a claim for unjust enrichment, a plaintiff must allege that: "(1) the [defendant] was enriched, (2) at [plaintiff's] expense, and (3) that it is against equity and good conscience to permit the [defendant] to retain what is sought to be recovered." *Georgia Malone & Co., Inc. v Rieder*, 19 NY3d 511, 516, 973 NE2d 743, 950 NYS2d 333 (2012) (internal quotations omitted).

102.    Defendants were unjustly enriched when they kept for themselves money that should have been paid to the Internal Revenue Service as Defendants' employer FICA contribution. Such came at the expense of Plaintiff because she will either (1) be liable to the IRS for the employer's share or (2) upon retirement suffer from diminished Social Security and Medicare benefits because she did not pay enough into the system.

103.    Accordingly, all sums that Defendants should have paid to the IRS should be disgorged from Defendants and transferred to Plaintiff.

## COUNT VI

## VIOLATION OF THE NEW YORK STATE HUMAN RIGHTS LAW

104.    Plaintiff realleges and reavers all the foregoing allegations in this Complaint as is fully set forth herein.

105.    Plaintiff was an employee and a qualified person within the meaning of the NYSHRL and Defendants are covered employers under the NYSHRL.

106.    Defendants violated Plaintiff's statutorily protected rights under the NYSHRL, New York Executive Law §296, by engaging in discriminatory employment practices and subjecting her to a hostile work environment based on her sex and gender. This hostile work environment was created and fostered through pervasive and regular sexual harassment from her manager in the form of comments, and behavior, including unwanted sexual advances, directed towards Plaintiff.

107.    The hostile work environment was sufficiently severe and pervasive to unreasonably interfere with Plaintiff's employment and/or create an intimidating, hostile, and offensive work environment for Plaintiff, which led to her constructive termination.

108.    Despite Plaintiff's complaints to Individual Defendant DMITRIY BEREZOVSKY, Individual Defendant allowed the harassment and hostile work environment to persist.

109.    Defendants' conduct was intentional, malicious, willful or in reckless disregard of Plaintiff's protected rights under the NYSHRL.

110.    As a result of Defendants' unlawful employment practices, Plaintiff sustained injury, including economic damages, the past and future emotional distress, and the costs of bringing this action.

111.    Due to Defendant's violation under the NYSHRL, based on gender discrimination and sexual harassment, Plaintiff is entitled to recover from Defendants: (1) economic damages, and (2) compensatory damages, (3) punitive damages, and (4) attorneys' fees and costs.

## COUNT VII

## VIOLATION OF THE NEW YORK CITY HUMAN RIGHTS LAW

112.    Plaintiff realleges and reavers all the foregoing allegations in this Complaint as if fully set forth herein.

113.    Plaintiff was an employee and a qualified person within the meaning of the NYCHRL and Defendants are covered employers under the NYCHRL.

114.    Defendants violated Plaintiff's statutorily protected rights under the NYCHRL, Administrative Code of the City of New York §8-107, by engaging in discriminatory employment practices and subjecting her to a hostile work environment based on her gender. This hostile work environment was created and fostered through her manager Juan's pervasive and regular sexual harassment in the form of comments and behavior directed towards Plaintiff.

115.    The hostile work environment was sufficiently severe and pervasive to unreasonably interfere with Plaintiff's employment and/or create an intimidating, hostile, and offensive work environment for Plaintiff's, which led to her constructive termination.

116.    Despite Plaintiff's complaints to management, Individual Defendant DMITRIY BEREZOVSKY allowed the harassment or hostile work environment based on gender to persist.

117.    Defendants' conduct was intentional, malicious, willful or in reckless disregard of Plaintiff's protected rights under the NYCHRL.

118.    As a result of Defendants' unlawful employment practices, Plaintiff sustained injury, including economic damages, past and future emotional distress, and the costs of bringing this action.

119.    Due to Defendants' violation under the NYCHRL, based on gender discrimination and sexual harassment, Plaintiff is entitled to recover from Defendant: (1) economic damages, (2) compensatory damages, (3) punitive damages, and (4) attorneys' fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court grant relief as follows:

a.    A preliminary and permanent injunction to prohibit Defendants from violating the

FLSA, NYLL, IRC, NYSHRL and NYCHRL;

b.  A declaratory judgment that the practices complained of herein are unlawful under the FLSA, NYLL, IRC, NYSHRL and NYCHRL;

c.  Appropriate equitable and injunctive relief to remedy Defendants' violations of federal law, including but not necessarily limited to an order enjoining Defendants from continuing its unlawful practices;

d.  An injunction against Defendants and their officers, agents, successors, employees, representatives and any and all persons acting in concert with them as provided by law, from engaging in each of the unlawful practices, policies, and patterns set forth herein;

e.  An award of unpaid wages, including overtime, due to time shaving under the FLSA and the NYLL;

f.  An award of unpaid wages, including overtime, due to improper rounding under the FLSA and the NYLL;

g.  An award of spread of hours premiums due under the NYLL;

h.  Contractual damages for Defendants' failure to keep their promise to abide by the Internal Revenue Code and fund Plaintiff's retirement through FICA contributions;

i.  Disgorgement from Defendants of all illegally retained sums that should have gone into FICA contributions;

j.  An award of economic damages, compensatory damages, and punitive damages due under NYSHRL and NYCHRL;

k.  An award of liquidated and/or punitive damages as a result of Defendants' willful failure to pay proper wages, including overtime compensation, pursuant to the FLSA and the NYLL;

l.  An award of statutory penalties as a result of Defendants' failure to comply with wage notice and wage statement requirements under NYLL;

m.  An award of statutory penalties, prejudgment and post judgment interest, costs and expenses of this action together with reasonable attorney's and expert fees and statutory penalties; and

n.  Such other and further relief as this Court deems just and proper.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury on all issues so triable as of right by jury.

Respectfully submitted,

Dated: March 8, 2024            By: __/s/ C.K. Lee_____
      New York, NY            C.K. Lee, Esq.
                              LEE LITIGATION GROUP, PLLC
                              C.K. Lee (CL 4086)
                              Anne Seelig (AS 3976)
                              148 W 24th St., 8th Floor
                              New York, NY 10011
                              Tel.: 212-465-1188
                              Fax: 212-465-1181
                              *Attorneys for Plaintiff*